UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTEN WILLIAMS, M.D.,

        Plaintiff,

v.                                Case No. 8:20-cv-1001-JSM-AEP

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

        Defendant.

_____/

## **REPORT AND RECOMMENDATION**

Plaintiff Kristen Williams, M.D. ("Dr. Williams") initiated this action, asserting claims under the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. § 1001 *et seq.*, against Defendant United of Omaha Life Insurance Company ("Omaha") and seeking long-term disability ("LTD") benefits and attorney's fees (Doc. 1). Essentially, Dr. Williams alleged that Omaha improperly denied her claim for LTD benefits under the applicable policy issued by Omaha. Dr. Williams and Omaha now each submit motions for summary judgment (Docs. 22 & 23), to which the other responds in opposition (Docs. 26 & 27). After consideration, and for the reasons that follow, it is recommended that Omaha's Motion for Summary Judgment (Doc. 22) be granted and Dr. Williams's Motion for Summary Judgment (Doc. 23) be denied.[1]

---

[1] The district judge referred the matter for issuance of a report and recommendation (Doc. 24). *See* 28 U.S.C. § 636.

## I.      Background

### A.      The Policy

On July 9, 2018, Dr. Williams began working for Anesthesia Associates, M.D., P.A. ("AA") as an anesthesiologist (R. 96, 433, 457, 1697-1701).[2]  Through her employment, Dr. Williams received group LTD coverage under insurance policy number GLTD-364D (the "Policy") issued by Omaha to AA (R. 1-38).  The Policy provides a 90-day waiting period, referred to as the "look-back period," with insurance beginning on the first day of the month that coincides with or follows the day the employee becomes eligible, and an elimination period that is the later of 180 calendar days or the date the employee's short-term disability ends (R. 11, 14, 19).  Given Dr. Williams's date of hire, her LTD coverage became effective on November 1, 2018, following expiration of the look-back period, which spanned from August 1, 2018 to October 31, 2018 (R. 96, 433, 457).[3]

The Policy provides that, if the employee becomes disabled due to an injury or sickness, while insured under the Policy, Omaha will pay the monthly benefit shown in the schedule in accordance with the terms of the Policy, with benefits

---

[2]  "It is well established that in reviewing a denial of ERISA benefits, the relevant evidence is limited to the record before the administrator at the time the decision was made." *Alexandra H. v. Oxford Health Ins., Inc. Freedom Access Plan*, 833 F.3d 1299, 1312 (11th Cir. 2016) (citations omitted).  Accordingly, all facts are taken from the administrative record, with all citations to the administrative record appearing in the foregoing format, with the number corresponding to the Bates Number located in the bottom righthand corner of the page(s) cited.

[3]  As discussed further below, Dr. Williams alleges that her disability began on December 3, 2018, subsequent to the effective date of the Policy coverage, when she suffered a stroke (*see* R. 1329-36).

2

beginning after the employee satisfies the elimination period (R. 14, 21). Upon meeting the proper criteria under the Policy, a Class 1 employee can receive a monthly LTD benefit of 60% of monthly earnings, with a maximum benefit of $10,000 per month (R. 11). Under the terms of the Policy, Dr. Williams would qualify for the maximum monthly benefit if she became disabled within the meaning of the Policy (R. 401, 457). To that end, the Policy defines "Disability" as follows:

> *Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which:
> 
> a) during the Elimination Period, You are prevented from performing at least one of the Material duties of Your Regular Occupation on a part-time or full-time basis; and
> 
> b) after the Elimination Period, You are:
> 
> 1. prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
> 
> 2. unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.
> 
> Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with the Policyholder.

(R. 30). As defined in the Policy, "sickness'" means a disease, disorder or condition, including pregnancy, that requires treatment by a physician, with the requirement that a disability resulting from a sickness must occur while the employee is insured under the Policy (R. 32). Notably, the Policy contains an exclusion for pre-existing conditions, which states:

**PRE-EXISTING CONDITION EXCLUSION**

A *Pre-existing Condition* means any Injury or Sickness for which You received medical treatment, advice or consultation, care or services, including diagnostic measures, or had drugs or medicines prescribed or taken in the 3 months prior to the day You become insured under the Policy.

We will not provide benefits for any Disability caused by, attributable to, or resulting from a Pre-existing Condition which begins in the first 12 months after You are continuously insured under the Policy.

(R. 23).  This exclusionary provision is at the center of the dispute before the court.

### B.     Dr. Williams's Medical History

### i.     Medical treatment prior to the look-back period[4]

Prior to the look-back period, Dr. Williams began treatment with Dr. Jeff Chapa at the Cleveland Clinic in October 2017 (R. 534-36).  Dr. Chapa noted that the initial visit involved a "preconceptional consultation due to mitral stenosis" (R. 534).  Dr. Chapa described Dr. Williams's treatment history leading up to the appointment, including a history of acute endocarditis originating from a foot blister in 2005 that required her to have a mitral valve repair and involved complications by a transient ischemic attack (TIA)[5] due to septic emboli, followed by severe mitral

---

[4]  Under the Policy, the look-back period, and only that period, was the timeframe Omaha was allowed to consider when it evaluated whether Dr. Williams suffered from a pre-existing condition.  *Bradshaw v. Reliance Standard Ins. Co.,* 707 F. App'x 599, 602 (11th Cir. 2017) (stating that the look-back period was the only period that an insurer could consider when evaluating whether the plaintiff suffered from a pre-existing condition under a LTD policy with similar pre-existing condition and look-back provisions).  The undersigned discusses the medical treatment occurring prior to the look-back period to provide context and a backdrop to what transpired both during the look-back period and after the look-back period.

[5]  A TIA, often referred to as a ministroke, involves a temporary period of symptoms similar to those of a stroke and can be a warning of a future stroke.  Mayo Clinic,

valve stenosis in 2013 that led her to the Cleveland Clinic for a redo of the repair of the mitral valve, after which Dr. Williams had done well (R. 501, 534).  According to Dr. Chapa, Dr. Williams took metoprolol 50 mg at that time (R. 534).[6]  Though Dr. Williams reported doing well from a functional standpoint in October 2017, Dr. Chapa reported that a June 2017 echocardiogram revealed a markedly enlarged left atrium and severe mitral stenosis based on a mean pressure gradient of 18 mm Hg (R. 534-35).  Dr. Chapa noted that Dr. Williams was scheduled to undergo mitral valve replacement the month prior, likely with a mechanical valve, but Dr. Williams canceled the procedure due to concerns with childbearing with a mechanical valve (R. 535).  Importantly, Dr. Chapa made the following notes:

> The decision regarding pregnancy is a complicated one with multiple aspects to consider.  In her current state, Kirsten could consider conceiving.  It is somewhat reassuring that Kirsten is not symptomatic (NYHA Class 1) despite her echocardiographic findings.  We discussed the added strain on the heart and cardiovascular system from the physiologic changes associated with pregnancy and that there would be some potential for cardiac decompensation during pregnancy (arrhythmia or congestive heart failure).  If such dysfunction were to occur during gestation, it could be managed medically[,] and pregnancy could be prolonged to advance gestational age to the point where neonatal outcomes would be more favorable.  We discussed that surgical interventions during pregnancy would be more limited, as given the prior mitral valve repairs, Kristen would not be a candidate for valvuloplasty.

---

https://www.mayoclinic.org/diseases-conditions/transient-ischemic-attack/symptoms-causes/syc-20355679 (last visited Apr. 8, 2021).

[6] Metoprolol is a beta-blocker used to treat high blood pressure and severe chest pain and lowers the risk of repeated heart attacks, which is given to people who have already had a heart attack and to treat patients with heart failure.  Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/metoprolol-oral-route/description/drg-20071141 (last visited Apr. 8, 2021).

If she were to have valve replacement surgery prior to conceiving, Kristen could have either a bioprosthetic replacement or a mechanical valve. With the former, this would be well tolerated during pregnancy; however, it would have a more limited lifespan and require replacement again. Alternatively, if a mechanical valve were placed, the pregnancy would require therapeutic anticoagulation. Risk for thrombosis of the valve is higher during pregnancy due to it being a hypercoagulable state. Maintaining a therapeutic state throughout pregnancy is more complicated due to the changing volume of distribution with advancing gestational age. Anticoagulation would involve both coumadin and low-molecular weight heparin, and there are some fetal risks to using coumadin.

At this point, Kristen seems to be leaning towards deferring valve replacement surgery until after she has completed childbearing. I advised her that if she were to conceive she will need to be followed closely by both cardiology and maternal-fetal medicine services. From a preconceptional standpoint, a program of moderate exercise, dietary modification, and weight loss might help Kristen conceive and reduce the risk for pregnancy[-]related complications. …

(R. 535).

Following that, in May 2018, Dr. Williams again met with Dr. Chapa, at which point Dr. Williams was pregnant with her first child (R. 537). Though Dr. Chapa indicated that Dr. Williams was doing well from a functional standpoint with no current symptoms, Dr. Chapa discussed the physiologic demands on the heart associated with pregnancy and the potential for cardiac decompensation, including development of heart failure and arrhythmias (R. 537). He further noted that Dr. Williams continued to take metoprolol 50 mg twice daily, which he indicated should be fine during pregnancy (R. 537). Dr. Chapa discussed the Cardio-Obstetrics Clinic at the Cleveland Clinic with Dr. Williams, who agreed to follow up and get a subsequent echocardiogram there in late June or early July 2018 and to seek out a maternal-fetal medicine practice in Orlando, where she planned

to move, along with a cardiologist with some familiarity with caring for pregnant women (R. 537).

Subsequently, in June 2018, Dr. Williams presented for her initial visit in the Cardio-Obstetrics Clinic, with the primary diagnosis listed as "[s]upervision of high risk pregnancy in second trimester" (R. 1462). Dr. Chapa reported that Dr. Williams was currently doing well from a functional standpoint, denied any significant activity limitations with her work as an anesthesiologist, was currently taking metoprolol 50 mg, and denied any dyspnea, chest pain, palpitations, or syncope (R. 538, 1462). Dr. Chapa further noted that, although Dr. Williams had done well postoperatively since her second surgery, she had again developed moderate to severe mitral valve stenosis, meaning she would eventually need replacement of her mitral valve (R. 538, 1462). Indeed, an echocardiogram performed that day revealed normal biventricular size and function, a markedly dilated left atrium, non-elevated right ventricular pressures, and severe mitral stenosis based on a peak gradient of 45 mm Hg and mean pressure gradient of 21 mm Hg, which appeared to have increased slightly from the prior year (R. 538, 1462). Dr. Chapa noted that he again reviewed physiologic changes associated with pregnancy, including a significant (up to 50%) increase in cardiac output and blood volume, which would not peak until the third trimester and would require close follow-up treatment throughout gestation given the potential for complications, such as congestive heart failure and arrhythmia (R. 538, 1462). Dr. Chapa indicated that Dr. Williams would be establishing prenatal care in Orlando in the near future,

while continuing to follow up with the Cleveland Clinic every four to six weeks or more frequently if needed, and that Dr. Williams had not yet made plans for delivery because the location would depend upon how the pregnancy progressed and how she did from a cardiac standpoint (R. 538, 1462).

Dr. Williams also met with Dr. David Majdalany at the Cleveland Clinic Cardio-Obstetrics Clinic in June 2018 (R. 502-21). At that time, Dr. Williams reported that she experienced occasional palpitations, usually lasting seconds but with a few episodes lasting a minute or so, during the past week (R. 503). Dr. Williams remained on metoprolol (R. 504). An echocardiogram conducted that day revealed a dilated left atrial cavity and mild mitral valve regurgitation with a peak gradient of 45 mmHg and a mean gradient of 21 mmHg (R. 507). Dr. Majdalany indicated that he held a lengthy discussion with Dr. Williams regarding the hemodynamic and physiologic changes of pregnancy and their impact on her cardiac status and the increased risk of arrhythmia and congestive heart failure (R. 507). Dr. Majdalany reported that Dr. Williams was asymptomatic, NYHA Class I-II[7] during her first trimester with mitral stenosis (severely elevated gradients which

---

[7]   According to the American Heart Association, the New York Heart Association (NYHA) Functional Classification system places patients in one of four categories based on how much they are functionally limited during physical activity. *Classes of Heart Failure*, American Heart Association, https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure (last visited Apr. 8, 2021). A class I classification correlates to no limitation of physical activity with ordinary physical activity causing no undue fatigue, palpitation, or dyspnea (shortness of breath). A class II classification correlates to a slight limitation of physical activity, comfortable at rest, and ordinary physical activity results in fatigue, palpitation, or dyspnea. A class III classification correlates to a marked limitation of physical activity, comfortable at rest, and less than ordinary activity causes fatigue, palpitation, or dyspnea. Finally, a class IV classification correlates to an inability to carry on any physical activity without discomfort,

may have been a little increased with increased volume/cardiac output due to pregnancy) and classified her as WHO Class III-IV[8] (R. 507).  Dr. Majdalany gave Dr. Williams a Zio patch to better assess the palpitations, advised continuing the beta-blocker, advised starting a low-dose aspirin regimen and explained the risks to the fetus, and advised taking an endocarditis prophylaxis peripartum (R. 508, 1183-94).

In July 2018, Dr. Williams met with Dr. Andrew Noll and Dr. Majdalany at the Cleveland Clinic's Cardio-Obstetrics Clinic (R. 522-34).  Dr. Noll described the prior medical history and findings and noted that Dr. Williams felt well since her last appointment with no complaints and great improvement to her palpitations with only rare occurrences at that time (R. 523).  Dr. Noll's examination notes indicated that Dr. Williams was 19 weeks pregnant with mitral stenosis, the left

---

symptoms of heart failure at rest, and, if any physical activity is undertaken, discomfort increases.

[8]  The modified World Health Organization (WHO) classification of maternal conditions measures the risk of pregnancy by medical condition and places patients in one of four categories.  Dr. Vassilis I. Barberis, *Cardiovascular disease and pregnancy: what to know*, European Society of Cardiology Council for Cardiology Practice e-journal, https://www.escardio.org/Journals/E-Journal-of-Cardiology-Practice/Volume-12/Cardiovascular-disease-and-pregnancy-what-to-know (last visited Apr. 8, 2021).  A class I classification correlates to no detectable increased risk of maternal mortality and no/mild increase in morbidity.  A class II classification denotes a small increased risk of maternal mortality or moderate increase in morbidity.  A class III classification correlates to a significantly increased risk of maternal mortality or severe morbidity, with expert counseling required, and, if pregnancy is decided upon, intensive specialist cardiac and obstetric monitoring required throughout pregnancy, childbirth, and the puerperium.  A class IV classification denotes an extremely high risk of maternal mortality or severe morbidity, with pregnancy contraindicated.  If pregnancy occurs, termination should be discussed, but, if pregnancy continues, the level of care would correlate to the level of care for a class III individual.

9

atrial cavity was dilated, her peak gradient was 41 mmHg and mean gradient was 21 mHG, her estimated right ventricular systolic pressure was likely underestimated due to a weak or incomplete tricuspid regurgitation signal but was consistent with mild pulmonary hypertension, and, in comparison to her prior echocardiographic exam in June 2018, her estimated right ventricular systolic pressure (RVSP) was a little higher (R. 525).   Indeed, the echocardiogram performed that day revealed mitral stenosis, dilation of the left atrial cavity, mild mitral valve regurgitation, mild pulmonary hypertension, and slightly increased RVSP (R. 527, 1198).   Dr. Noll concluded that the echocardiogram showed stable mitral valve gradients and slightly increased RVSP along with only trace edema and no other symptoms suggesting heart failure (R. 527).   Dr. Noll found that Dr. Williams was doing well, with NYHA I-II symptoms stable and only rare palpitations (R. 527).   Dr. Noll classified Dr. Williams as a WHO class III-IV with regard to risk of complications during pregnancy and peripartum period and thus recommended close follow-up care with the Cardiology Obstetrics Clinic every four to six weeks (R. 527).  Notably, Dr. Noll indicated that he discussed the fact that elevated gradients would be expected due to increase blood volume and cardiac output and that Dr. Williams would require close monitoring for signs and symptoms of heart failure and arrhythmia (R. 523).   He also recommended that Dr. Williams continue on metoprolol and aspirin and provided Dr. Williams with information for cardiologists who specialized in high-risk obstetrics in Florida (R. 527).

### ii.    Medical treatment during the look-back period

During the look-back period, Dr. Williams received medical treatment from Dr. Quyen Nguyen, an obstetrician/gynecologist, and Dr. Maria Demori, a cardiologist.  Dr. Williams established her initial visit with Dr. Nguyen on August 20, 2018, at which time Dr. Nguyen noted that Dr. Williams was 24 weeks' pregnant and of advanced maternal age (R. 1428).  Dr. Williams's current medications included aspirin and metoprolol, each taken once per day (R. 1428). Dr. Nguyen noted that Dr. Williams's past medical history included a history of mitral valve repair and endocarditis and past surgical history included a mitral valve repair in 2005 with a revision of the mitral valve repair in 2013 (R. 1428).

On August 31, 2018, after recently relocating to Orlando, Dr. Williams presented to Orlando Health Heart Institute Cardiology Group for an initial cardiovascular evaluation with Dr. Demori upon referral from Dr. Nguyen (R. 1106-11).  Dr. Demori noted that Dr. Williams was 26 weeks into her pregnancy, with a due date of December 4, 2018 (R. 1111).  At that time, Dr. Williams's medications included aspirin and metoprolol, each taken once daily (R. 1106).  Dr. Demori noted that Dr. Williams's indications included mitral valve stenosis, status post mitral valve repair, and a history of endocarditis (R. 1107).  On that day, Dr. Williams submitted to an echocardiogram, which showed an annuloplasty ring present in the mitral valve of the right ventricle; elevated transmitral gradients, with a mean of 14 mmHg and a peak of 31 mmHg at a heart rate of 68 beats per minute; abnormal functioning of the prosthetic mitral valve; mild anterior and posterior

mitral leaflet thickening; trace mitral valve regurgitation; mild aortic valve regurgitation; trace pulmonic valve regurgitation; trace tricuspid valve regurgitation; and mild pulmonary hypertension (R. 1107-10, 1206-10). Upon examination, Dr. Demori found regular S1 and S2 heart sounds but no S3 or S4 heart sounds and a 2/4 diastolic murmur (R. 1111).

After examination, Dr. Demori's impressions included a finding of a history of mitral valve endocarditis, status post mitral valve repair in 2005, and a redo mitral valve repair in 2013 due to stenosis of the prior bioprosthetic valve (R. 1111). According to Dr. Demori, Dr. Williams was euvolemic with elevated gradients consistent with mitral stenosis, putting her in a NYHA class I classification (R. 1111). In describing Dr. Williams's history of mitral valve issues, Dr. Demori described the July 2018 echocardiogram as indicating severe mitral stenosis with elevated gradients (R. 1111). She referenced Dr. Jeff Chapa's August 3, 2018 treatment note stating that, prior to conceiving, Dr. Williams opted against mitral valve replacement, deferring such procedure until childbearing, because she wanted a mechanical valve but did not want to deal with anticoagulation issues and thrombotic risk associated with pregnancy (R. 1111). Dr. Demori also indicated that Dr. Williams experienced mild pulmonary hypertension associated with mitral stenosis, which placed her in a WHO functional class I classification (R. 1111). Dr. Demori further indicated that Dr. Williams's palpitations resolved based on results of a two-week event recorder (R. 1111).

Given her findings, Dr. Demori identified Dr. Williams's WHO maternal cardiovascular risk level as a WHO class III/IV, meaning a significant increase to an extremely high risk of maternal mortality or severe morbidity (R. 1111). Dr. Demori also noted the elevated mitral valve gradients, partially attributing the elevation to an increase in cardiac output and volume related to pregnancy (R. 1111). Dr. Demori scheduled another echocardiogram to occur in four weeks, with the stated purpose of monitoring the mitral valve gradients, the RVSP, and right ventricle, and noted that Dr. Williams should follow up after that echocardiogram (R. 1111).

Dr. Williams followed up with Dr. Nguyen on September 13, 2018, at which time Dr. Williams was 28 weeks' pregnant (R. 1426-27). Dr. Nguyen listed metoprolol and aspirin, each taken once daily, as part of Dr. Williams's current medication regimen (R. 1426). At that appointment, Dr. Williams received a Tdap immunization and her past medical history included an update to include mitral stenosis and mild pulmonary hypertension, but Dr. Nguyen made no other significant findings (R. 1426). Two weeks later, Dr. Williams returned to see Dr. Nguyen, when she was 30 weeks' pregnant (R. 1424). Dr. Nguyen assessed Dr. Williams with mitral valve stenosis and provided Dr. Williams with a flu shot (R.1424). She also again noted that Dr. Williams took metoprolol and aspirin once daily (R. 1424). Following that, Dr. Williams went for another prenatal visit with Dr. Nguyen on October 10, 2018, when she was 33 weeks' pregnant (R. 1422). Dr.

Nguyen rendered no significant findings but again noted that Dr. Williams continued to take metoprolol and aspirin (R. 1422).

On that same day, Dr. Williams underwent another echocardiogram upon orders from Dr. Demori (R. 1211-14).  The October 2018 echocardiogram showed gradients across the prosthetic mitral valve were abnormal, with the elevated mean transmitral gradient at 10-11 mmHg at a heart rate of 69 beats per minute (R. 1212). In addition, the echocardiogram showed mild dilation of the left atrium, mild mitral valve regurgitation, mild anterior and posterior mitral leaflet thickening, and mild to moderate tricuspid valve regurgitation but no evidence of pulmonary hypertension (R. 1212-13).  Subsequently, Dr. Williams met with Dr. Nguyen on October 23, 2018 for another pre-natal appointment, at which time she was 34 weeks' pregnant (R. 1420).  Though Dr. Nguyen again noted Dr. Williams's mitral valve disease and that Dr. Williams continued to take metoprolol and aspirin daily, she did not make any other significant findings (R. 1420).

### iii.    Medical treatment following the look-back period

Following the look-back period, Dr. Williams presented to Dr. Nguyen for two more pre-natal appointments in November 2018, at which she was 36 and 37 weeks' pregnant, respectively (R. 1416-19).  The first treatment note indicated an assessment of rheumatic mitral stenosis with insufficiency, while the second treatment note indicated an assessment of mitral valve disease (R. 1416-19).  As with her prior treatment notes, neither of the November 2018 treatment notes indicated any treatment plan related to the mitral valve issue, but the treatment

notes indicated that Dr. Williams continued to take metoprolol and aspirin daily (R. 1416, 1418).

In November 2018, Dr. Williams also presented to Dr. Demori, who reiterated her indications and findings from August 31, 2018 (R. 1011-13).  She noted that Dr. Williams continued to take metoprolol and aspirin (R. 1011).  Dr. Demori classified Dr. Williams as a WHO III/IV, noted elevated mitral valve gradients partially related to the increased cardiac output and volume related to pregnancy, and concluded that no cardiovascular contraindication for a normal vaginal delivery existed, but she recommended that Dr. Williams be admitted to the intensive care unit (ICU) at the time of delivery or induction and an echocardiogram be repeated once Dr. Williams was admitted to the hospital (R. 1013).

Upon referral for a consultation, Dr. Neeraj Desai, from the Maternal-Fetal Medicine Center at Winnie Palmer Hospital, met with Dr. Williams on November 16, 2018 (R. 851-54).  Dr. Desai indicated that the follow-up consultation was secondary to maternal heart disease, specifically, mitral valve disorder, mitral stenosis secondary to history of endocarditis, and status post mitral valve repair twice (R. 852).  Though Dr. Williams reported doing well clinically following her operations, Dr. Desai noted that the June 2018 echocardiogram demonstrated severe mitral stenosis, elevated from the prior year, and a markedly dilated left atrium (R. 852).  Dr. Desai further indicated that Dr. Williams currently took metoprolol once per day, possessed good knowledge of her condition, and had been followed so far in her pregnancy with the cardiology and obstetrics clinic at the

Cleveland Clinic, including maternal-fetal medicine and cardiology (R. 852-53). Dr. Desai indicated that Dr. Williams's cardiovascular risk registered as a WHO III/IV, meaning significantly increased risk to extremely high risk of maternal mortality or severe morbidity, and that the elevated mitral valve gradients appeared partially related to the increased cardiac output and volume relating to pregnancy (R. 853).

Following these appointments, Dr. Williams scheduled her induction to occur on November 20, 2018 (R. 1442-45). The diagnosis cited as the basis for the induction was mitral stenosis, and the scheduling note indicated that Dr. Williams should be admitted to the ICU for the induction (R. 1443, 1477). Given the date of her induction, Dr. Williams last worked at AA on November 19, 2018 (R. 96-98, 1571). On November 20, 2018, Dr. Williams was admitted to Orlando Health for her scheduled induction (R. 1477). The admission note indicated that Dr. Williams's pregnancy was complicated by, among other things, a maternal history of mitral valve stenosis, stating that Dr. Williams was status post mitral valve repair twice, and, accordingly, cardiology, maternal fetal medicine, and anesthesia had been following Dr. Williams (R. 1477). The note further indicated that Dr. Williams presented for a scheduled induction at 38 weeks per maternal medicine's recommendation due to the history of mitral stenosis (R. 1477). The admission note additionally stated that Dr. Williams remained stable during pregnancy and presented with no complaints on that day (R. 1477). With respect to her

prescriptions at the time of admission, Dr. Williams still took both aspirin and metoprolol daily (R. 1478).

Notwithstanding normal rate and rhythm upon examination of the heart at the time of admission, Dr. Williams was admitted to the woman's ICU for monitoring, given her cardiac history, and scheduled for a maternal fetal medicine consultation, cardiology consultation, and maternal echocardiogram as well as endocarditis prophylaxis during labor (R. 1478). The echocardiogram performed that day indicated mild dilation of the left atrium, mild pulmonic valve regurgitation, and moderate mitral valve stenosis (R. 1220). Dr. Williams proceeded to give birth to her daughter on November 21, 2018, following induction (R. 1480-81). The delivery report indicated no complications occurred during delivery (R. 1480-83).

Unfortunately, on December 3, 2018, during her post-partum recovery period, Dr. Williams arrived at Winter Haven Hospital via ambulance complaining of slurred speech, facial droop, and left-side weakness (R. 1329). The initial notes from the emergency department stated that Dr. Williams endured two mitral valve replacements, with the last time she experienced these sorts of symptoms occurring due to an infection of the mitral valve (R. 1329). Additionally, the notes indicated that Dr. Williams was not on any anticoagulants, had an echocardiogram just before she gave birth due to the high-risk nature of her pregnancy, and delivered in the ICU (R. 1329).

CT scans and an MRI demonstrated that Dr. Williams suffered an ischemic cerebrovascular accident, or stroke, with hemorrhagic conversion (R. 1166, 1170-73, 1327-28, 1333-34). An echocardiogram indicated that Dr. Williams experienced at least moderate mitral stenosis with trace mitral regurgitation and mild tricuspid regurgitation at that time (R. 1227-28). During her admission, Dr. Williams underwent a carotid cerebral angiogram as well, with the treatment note indicating a successful aspiration thrombectomy of an occluded right cervical and intracranial internal carotid artery, carotid terminus, and right middle cerebral artery with restoration of TICI 3 flow into the right middle and anterior cerebral artery distributions with no residual angiographic abnormalities (R. 1163). According to the radiologist, Dr. Williams showed no obvious distal embolism, no evidence of carotid dissection, and a fairly sizable mixed red and white thrombi aspirated (R. 1163). Given the findings, the radiologist questioned whether a cardiac source existed for the thromboembolic event, particularly in light of Dr. Williams's mitral valve surgery in the past, in conjunction with possible hypercoagulable state in the setting of her postpartum status (R. 1163-64).

Diagnostic imaging during her initial admission at Winter Haven Hospital showed that Dr. Williams had an enlarged heart with postoperative changes but no acute process and no acute cardiopulmonary disease (R. 1161, 1165). An echocardiogram revealed moderate mitral stenosis and mild mitral and tricuspid regurgitation (R. 1230). By December 7, 2018, Dr. Williams's intracranial hemorrhage appeared stable, and Winter Haven Hospital discharged her that day

(R. 1169, 1327-28).   On December 8, 2018, however, Dr. Williams experienced chest and abdominal pain, with a CT scan confirming that Dr. Williams suffered from a pulmonary embolism with bilateral emboli (R. 1174-75, 1319-26).   Separate diagnostic imaging revealed that her intracranial hemorrhage appeared unchanged with no additional new areas of hemorrhage, that she did not have any apparent congestive heart failure, and that her lungs remained clear (R. 1176, 1177, 1322-24).

Two days later, Dr. Williams was discharged from Winter Haven Hospital (R. 1317-18).   The next day, Dr. Williams began speech therapy and occupational and physical rehabilitation services, which she continued through at least the end of March 2019 (R. 545-619).   Dr. Williams also continued to receive cardiac treatment from Dr. Demori from December 2018 through at least May 2019 (R. 1014-27, 1052-53, 1112-25).

On December 14, 2018, a CT scan indicated that Dr. Williams no longer experienced any acute intracranial abnormality (R. 1179).   Subsequently, a CTA scan of Dr. Williams's chest indicated that she no longer experienced a pulmonary embolic phenomenon as of March 28, 2019 (R. 1180).   The next day, Dr. Arnaldo Velez, a neurologist, met with Dr. Williams upon referral from Dr. Demori, and decided to admit Dr. Williams to the hospital for further workup and start her on a heparin drip, given that Dr. Williams previously was discharged without anticoagulation despite her known atrial thrombus (R. 472, 475).   Upon admission, the hospital started Dr. Williams on a heparin drip, transitioned her medication to Eliquis, and performed a transcranial doppler study, which demonstrated a single

embolic track (R. 472).  Dr. Velez's impression was that Dr. Williams's stroke likely occurred from her hypercoagulable state of pregnancy in setting of the left atrial thrombus (R. 474, 475).  After a January 2019 follow-up appointment, Dr. Velez's plan of care included another echocardiogram, another doppler, neuropsychological testing, continuing Eliquis, a hematology consultation given the need for anticoagulation, and continuation of speech therapy, occupational therapy, and physical therapy (R. 474).

### C.   Procedural History

Dr. Williams submitted her claim for LTD benefits to Omaha on May 9, 2019 (R. 1562-86).  Dr. Williams asserted that she became disabled as a result of the stroke suffered on December 3, 2018, at which time she was only 38 years old (R. 1562-63).   Namely, Dr. Williams asserted that she suffered from cognitive impairments that precluded her ability to safely work in the operating room and thus prevented her from performing the material duties of a clinical anesthesiologist (R. 1562-63).  Despite months of neurorehabilitation, Dr. Williams stated that she no longer possessed the mental acuity to safely perform the work of an anesthesiologist, and, in fact, AA terminated her employment, effective May 6, 2019 (R. 1563).

In support of her claim, Dr. Williams provided a March 2019 neuropsychological evaluation report from Dr. Jeffrey Reddout and a May 2019 physician's statement from Dr. Reddout (R. 1574-86).  In his physician's statement, Dr. Reddout indicated that Dr. Williams should not perform any work that might

require quick thinking, responding to urgent or emergent situations, quick analysis and planning, calculations, and complex reasoning (R. 1575-76).   Based on his neuropsychological evaluation of Dr. Williams, Dr. Reddout opined that Dr. Williams could not respond adequately to urgent or emergent clinical situations due to deficits in mental processing, speed, concentration, arithmetical calculation, numerical reasoning, and executive functions (R. 1576).  Dr. Reddout determined that, although Dr. Williams might show some improvements over the next year, it remained unclear whether the improvements would be significant and rather appeared unlikely that any improvements would be sufficient to allow Dr. Williams to return to her prior level of functioning and, more importantly, to return to her prior work as an anesthesiologist (R. 1575).  As a result, Dr. Reddout concluded that Dr. Williams should not return to clinical work (R. 1576).  Likewise, in his neuropsychological evaluation report, Dr. Reddout opined that, because of the concerns about the lingering cognitive sequelae from the December 2018 stroke, Dr. Williams should be considered disabled from resuming her work as an anesthesiologist in any clinical setting, although he indicated that she might be able to perform adequately at her level of training in academic and nonclinical settings or in alternate types of medical practice (R. 1585).  Dr. Reddout stated that it was not clear whether Dr. Williams would ever regain the ability to resume a career as an anesthesiologist, but he reiterated that she was "clearly currently disabled from [the] practice of clinical anesthesiology (R. 1585).

Upon consideration of her claim, Omaha issued a denial on September 5, 2019 (R. 430-40, 457-65).  According to Omaha, since Dr. Williams's disability began within the first 12 months of her coverage effective date, Omaha indicated that a pre-existing conditions investigation was necessary, with the three-month look-back period extending from August 1, 2018 through October 31, 2018 (R. 433). Accordingly, Omaha considered the Policy, Dr. Williams's employee statement, AA's employer statement, her prior insurer's certificate of insurance and LTD coverage form, Dr. Reddout's attending physician statement, pharmacy records from June 2017 through June 2019, medical records from October 2017 through May 2019, and a medical review completed by Omaha's medical consultant (R. 432-33).  After consideration, Omaha denied the claim based on the pre-existing condition exclusion, finding that Dr. Williams's stroke was attributed to her pre-existing diagnosis of pregnancy and mitral valve stenosis, for which Dr. Williams received diagnostic care and consultation during the look-back period (R. 430-37). Specifically, after summarizing the evidence, Omaha determined that:

> During the pre-existing conditions look[-]back period of August 1, 2018, through October 31, 2018, you received medical treatment, advice or consultation, care or services, including diagnostic measures, or had drugs or medicines prescribed or taken for: pregnancy and mitral valve stenosis.
>
> Your disability began on November 20, 2018, as a result of your pregnancy, when your labor was induced.  Following the delivery of your child on November 21, 2018, the regular expected period of recovery, before being able to return to work, would have been six weeks, through December 31, 2018.  The medical records received for your file document that you were treated for pregnancy during the pre-existing look back period of August 1, 2018, through October 31, 2018.

Before a reasonable period for recovery from your delivery on November 21, 2019 had passed, on December 3, 2018 you suffered a stroke resulting in your ongoing impairment.  Your medical records document that you have a significant history of mitral valve stenosis and mitral valve repair, for which you were being monitored during the pre-existing lookback period of August 1, 2018 through October 31, 2018.

Your stroke on December 3, 2018, was caused by the formation of a thrombus in your left atrium and subsequent right carotid artery occlusion.  The combination of increased cardiac output and blood volume during pregnancy, hypercoagulable state during pregnancy and post-partum and your significant history of mitral valve stenosis, for which you were not on antiplatelet therapy, resulted in the thrombus formation in your left atrium and blockage in your carotid artery.  Based on the information in your medical records, your stroke on December 3, 2018, which resulted in your ongoing disability, was caused by your pregnancy and your mitral valve stenosis.

In summary, you became disabled on November 20, 2018, due to childbirth.  Prior to recovering, you suffered a stroke on December 3, 2019.  Your stroke is attributable to and resulting from your diagnosis of mitral valve stenosis, as well as your pregnancy.  You received medical treatment, advice and consultation, care and services, including diagnostic measures for your pregnancy and mitral valve stenosis during the pre-existing look[-]back period of August 1, 2018 through October 31, 2018.  Therefore, your current disabling condition is considered a Pre-[]existing Condition and excluded under the policy No benefits are payable and your claim for Long Term Disability benefits has been denied.

(R. 437).

Following the denial of her claim, Dr. Williams submitted an appeal to Omaha on March 2, 2020, arguing that Omaha's interpretation and application of the Policy was wrong and unreasonable (R. 97, 103, 172-248).  Primarily, Dr. Williams indicated that she disagreed with the findings that her stroke constituted a pre-existing condition under the Policy, as the stroke occurred after the look-back period and as the prior diagnoses of mitral valve stenosis and pregnancy constituted

mere risk factors for her stroke (R. 97, 103, 173-74).  Dr. Williams argued that her disability was not caused by, attributable to, or resulting from her pregnancy or mitral valve stenosis but rather was caused by her stroke (R. 97, 103, 173-74).  Notwithstanding, Dr. Williams argued that Omaha treated the risk factors of mitral valve stenosis and pregnancy as proxies for preexisting conditions (R. 174).  Given the lack of treatment during the look-back period for a stroke, the condition she alleged was disabling, Dr. Williams asserted that her stroke did not constitute a preexisting condition (R. 97, 103, 173-76).

In support of her appeal, Dr. Williams provided the March 2019 neuropsychological evaluation report from Dr. Reddout; an October 2019 neuropsychological evaluation report from Dr. Kristjan Olafsson; a November 2019 neuropsychological evaluation report from Dr. Steven E. Rothke; a January 2020 letter from Dr. Demori, her treating cardiologist; and copies of two federal-court cases considering similar issues under ERISA (R. 178-248).  Upon referral by Dr. Williams's counsel, Dr. Olafsson examined Dr. Williams (R. 193-202).  Similar to Dr. Reddout, Dr. Olafsson opined that Dr. Williams's significant deficits in attention and concentration, as well as deficits in sustained attention, divided attention, and higher verbal abstraction, would preclude Dr. Williams from safely managing job duties as an anesthesiologist (R. 201).  According to Dr. Olafsson, the current test results indicated a significant decline in cognitive functions in comparison with premorbid functioning that would preclude her from employment in such a demanding position (R. 201).  Considering the time that had elapsed since

the stroke, Dr. Olafsson believed that any additional recovery was unlikely, and Dr. Williams would continue to present with cognitive deficits precluding her from employment as an anesthesiologist (R. 201).

Dr. Rothke subsequently reviewed the two prior neuropsychological evaluation reports, finding that both evaluations were considered accurate assessments of Dr. Williams's cognitive and psychological functioning (R. 203-04). He explained that both prior evaluations confirmed that Dr. Williams would be unable to perform the duties of her occupation as an anesthesiologist safely and reliably (R. 205). In Dr. Rothke's opinion, no further recovery could be expected that would prove sufficient for Dr. Williams to return to her former occupation as an anesthesiologist (R. 205).

The letter from Dr. Demori consisted of responses to questions posed to her by Dr. Williams's counsel (R. 206-07). Dr. Demori indicated that Dr. Williams experienced an uneventful pregnancy and, though her transmitral gradients were elevated during pregnancy, such elevation was likely related to the elevated cardiac output normally occurring during pregnancy (R. 206). According to Dr. Demori, Dr. Williams remained asymptomatic from a cardiovascular standpoint throughout her pregnancy, and her transmitral gradient significantly improved following pregnancy, as demonstrated by the transesophageal echocardiogram three to four months after delivery (R. 206). Dr. Demori stated that Dr. Williams did not require anticoagulation therapy during pregnancy, as there was no indication for anticoagulation under any American College of Cardiology or American Heart

Association guidelines (R. 206).   In addition, Dr. Williams did not show any evidence of arrhythmias that could increase stroke, and she only took 81mg of aspirin daily (R. 206).  Dr. Demori opined that Dr. Williams experienced elevated transmitral gradients during pregnancy that were associated with the increased volume and cardiac output related to pregnancy not to true anatomic significant mitral stenosis (more functional mitral stenosis) (R. 207).  In Dr. Demori's opinion, the fact that Dr. Williams's transmitral gradients significantly improved three to four months after delivery weighed against a finding of significant mitral stenosis (R. 207).  Though Dr. Williams's gradient post-delivery remained mildly elevated for status post mitral valve repair, the gradient was not elevated enough to cause symptoms or require intervention (R. 207).  As a result, Dr. Demori did not believe the mitral stenosis constituted the likely cause of the stroke (R. 207).

Given Dr. Williams's appeal, Omaha submitted the file for internal physician review to Dr. Thomas Reeder, Omaha's Vice President and Medical Director, who is a licensed physician and diplomate of both the American Board of Internal Medicine and the National Board of Physicians and Surgeons (R. 97, 139-44). Notably, Dr. Reeder's March 10, 2020 medical review concluded that Dr. Williams had severe mitral stenosis during pregnancy and that the hypercoagulable state secondary to pregnancy and severe mitral stenosis are conditions that contributed to the development of stroke and her residual cognitive defects (R. 139-44). Following that, in a March 19, 2020 letter, Omaha provided Dr. Williams with a copy of the medical review from Dr. Reeder and asked that any response or

additional information be provided by April 2, 2020 (R. 137-44).  Dr. Williams responded with a letter on March 31, 2020, asserting that Dr. Reeder's opinion was bare and did not show that mitral valve stenosis and pregnancy had in fact substantially contributed to Dr. Williams's stroke (R. 127).  Dr. Williams asked that Omaha not "blindly accept Dr. Reeder's opinion to deny Dr. Williams's appeal" and posed several questions to assist Omaha "to make the correct decision and in the spirt of maintaining a meaningful dialogue," including asking whether Omaha believed that risk factors were sufficient to exclude a disability as a pre-existing condition, that Dr. Williams's disability caused by stroke could be excluded because her hypercoagulable state was caused by her pregnancy, and that Dr. Reeder was in a better position than Dr. Demori to provide an opinion regarding whether Dr. Williams's mitral valve history caused or contributed to her stroke (R. 127-28).

Upon review, Omaha confirmed that the denial based on the pre-existing condition exclusion was appropriate and therefore upheld the denial (R. 97-98).  On April 7, 2020, Omaha sent Dr. Williams a letter summarizing its findings and notifying Dr. Williams that Omaha upheld the denial of her claim such that no benefits were payable to her under the Policy (R. 102-08).  In considering her appeal, Omaha indicated that it reviewed the LTD employee statement from Dr. Williams, the LTD employer statement from AA, the attending physician's statement from Dr. Reddout, medical records from June 2017 through November 2019, the medical review from Dr. Reeder from March 2020, letters from Dr. Williams, and the LTD

policy booklet for AA with the Policy (R. 102-03).[9]   After reviewing all of the documentation on file, including Dr. Williams's March 31, 2020 letter, Omaha determined that Dr. Williams received medical treatment, advice or consultation, or care or services for her pregnancy during the pre-existing condition review period and that her subsequent stroke was caused by, attributable to, or resulting from her pregnancy and severe mitral stenosis (R. 105).   Accordingly, Omaha upheld the denial of Dr. Williams's LTD claim (R. 105).   Omaha additionally noted that Dr. Williams had exhausted all of her administrative rights to appeal, so Omaha would conduct no further review of the claim and would instead close the file (R. 105).

Following the denial of her claim and the exhaustion of her appeals under ERISA, Dr. Williams initiated this action, asserting claims for LTD benefits (Count I) and attorney's fees (Count II) under the Policy pursuant to ERISA (Doc. 1). Currently before the court are the parties' cross-motions for summary judgment and the respective responses in opposition thereto (Docs. 22, 23, 26, 27).  By her motion, Dr. Williams argues that Omaha's denial of benefits was wrong and unreasonable as the pre-existing exclusion did not apply to preclude an award of LTD benefits to Dr. Williams (Doc. 23).   Dr. Williams premises her argument upon Omaha's purported improper but-for theory of causation used to exclude a disability based on a stroke, which Dr. Williams did not receive treatment for during the look-back

---

[9]  The letter indicates that, since Dr. Williams's claimed disability commenced within 12 months of the effective date of her coverage under the Policy, Omaha obtained medical records for the period of August 1, 2018 through November 1, 2018 to determine whether the pre-existing condition provision applied to her claim (R. 103).

period.   According to Dr. Williams, Omaha engaged in the following flawed analysis in erroneously denying her claim for LTD benefits: but for Dr. Williams's pregnancy and mitral stenosis, she would not have developed a thrombus in her left atrium; and, but for that thrombus, Dr. Williams's carotid artery would not have become occluded, and she would not have suffered a stroke; and, but for her stroke, Dr. Williams would not be disabled.

In turn, Omaha contends that substantial evidence in the record demonstrates that it reasonably determined that the pre-existing condition exclusion barred Dr. Williams's claim (Doc. 22).  More specifically, Omaha asserts that Dr. Williams's conditions constituted pre-existing conditions within the terms of the Policy and those conditions caused or resulted in her disability, thus precluding an award of LTD benefits to Dr. Williams.  Omaha further contends that, under the framework for considering the propriety of ERISA benefit decisions, the conflict of interest arising from Omaha making eligibility decisions and paying benefits out of its own funds should not be afforded any significant weight in the consideration of its decision to deny benefits in this instance.

## II.    Legal Standard

The purpose of ERISA is to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113 (1989) (citations and quotation marks omitted).  A participant or beneficiary may bring a civil action under ERISA to recover benefits due to him or her under the terms of an employee benefit plan,

to enforce his or her rights under the terms of the plan, or to clarify his or her rights to future benefits under the terms of the plan.  29 U.S.C. § 1132(a)(1)(B); *see Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  ERISA remains silent, however, on which standard of review applies to actions challenging adverse benefit determinations.  *Firestone*, 489 U.S. at 109; *see Alexandra H.*, 833 F.3d at 1311.  To fill that gap, the Supreme Court established a framework for determining the appropriate standard for review in ERISA cases.  *See Firestone,* 489 U.S. at 115; *see also Glenn*, 554 U.S. at 112-19.  Namely, a denial-of-benefits challenge is reviewed under a *de novo* standard unless the benefit plan provides the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Firestone*, 489 U.S. at 115.  If a benefit plan provides discretion to an administrator or fiduciary who operates under a conflict of interest, that conflict must be weighed as a factor, among other considerations, in determining whether there is an abuse of such discretion.  *Id.*; *see Glenn*, 554 U.S. at 117 ("We believe that *Firestone* means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one.").  In an ERISA case, the standard of review for summary judgment therefore depends on whether the administrator maintained discretion to deny a claim.  *Alexandra H.*, 833 F.3d at 1311.  Basically, the default standard of review is *de novo* unless the plan vests discretion in the plan administrator to determine benefit claims.  *Firestone*, 489 U.S. at 115.

Given this framework, the Eleventh Circuit established the following test for courts reviewing an administrator's adverse benefit determination:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011) (citation and footnote omitted). Whether an administrator's decision is either *de novo* correct or reasonable constitutes a question of law. *Id.* at 1354.

Under this test, a conflict of interest exists where an ERISA plan administrator both makes eligibility decisions and pays awarded benefits out of its own funds. *Id.* (citing *Glenn*). In this instance, with respect to the authority to interpret its terms, the Policy provides discretion to Omaha, stating in pertinent part:

By purchasing the Policy, the Policyholder grants Us the discretion and the final authority to construe and interpret the Policy. This

31

> means that We have the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as interpreted by Us.  Benefits under the Policy will be paid only if We decide, in Our discretion, that a person is entitled to them.  In making any decision, We may rely on the accuracy and completeness of any information furnished by the Policyholder, You or any other third party.
>
> The Policyholder further grants Us the authority to delegate to third parties, including, without limitation, United of Omaha Life Insurance Company and any third party administrator with whom We have contracted to provide claims administration and other administrative services, the discretionary authority granted in the Policy.  The Policyholder expressly grants such third party the full discretionary authority granted to Us under this Policy.

(R. 26).  Where, as here, a conflict of interest exists, and the court reaches step six, the burden remains with the plaintiff to demonstrate that the decision was arbitrary rather than on the defendant to prove its decision was not tainted by self-interest. *Blankenship*, 644 F.3d at 1355 (citation omitted).  Indeed, "[e]ven where a conflict of interest exists, courts still owe deference to the plan administrator's discretionary decision-making as a whole." *Id.* (citations, footnote, and internal quotation marks omitted).  In the end, although courts must consider structural conflicts of interest as a factor in the analysis, the analysis centers upon assessing whether a reasonable basis existed for the administrator's benefits decision. *Id.* (citations omitted).

## III.   Discussion

A plaintiff seeking to recover benefits under ERISA bears the burden of proving entitlement to those benefits, but, "where an insurer contends that an exclusion contained in the policy applies to deny benefits, the burden generally falls on the insurer to prove the exclusion prevents coverage." *Bradshaw*, 707 F. App'x

at 606 (citations omitted).  As articulated above, Omaha based its denial upon the pre-existing condition exclusion and thus bears the burden of demonstrating that the exclusion prevented Dr. Williams's LTD coverage.  Omaha meets its burden in this instance.  While the undersigned appreciates Dr. Williams's arguments, the record belies her position.  Namely, *de novo* review indicates that Omaha's denial decision was not wrong and, even if Omaha's decision was *de novo* wrong, reasonable grounds supported the denial decision, and the conflict of interest did not render the decision arbitrary and capricious.

While comprehensive, ERISA remains silent on matters of contract interpretation.  *Dixon v. Life Ins. Co. of N. Am.*, 389 F.3d 1179, 1183 (11th Cir. 2004).  Federal common law therefore generally governs issues in ERISA actions not covered by the Act itself, with federal courts looking to state law as a model, given the states' greater experience in interpretation of insurance contracts and resolution of coverage disputes.  *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1234-35 (11th Cir. 2006) (citations omitted); *Horton v. Reliance Std. Life Ins. Co.*, 141 F.3d 1038, 1041 (11th Cir. 1998); *cf. Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1140 (11th Cir. 2001) (indicating that the Eleventh Circuit has authorized "federal courts to create federal common law to implement Congress' statutory scheme" under ERISA).  In determining whether a rule should become part of ERISA's common law, courts examine whether the rule, if adopted, furthers ERISA's scheme and goals, including (1) protection of the interests of employees and their beneficiaries

in employee benefit plans, and (3) uniformity in the administration of employee benefit plans.  *Tippitt*, 457 F.3d at 1235 (quotations and citations omitted).

Here, the Policy indicates that it was issued and would be interpreted by the laws of the State of Florida (R. 1).  The construction of insurance contracts under Florida law is thus instructive.   Under Florida law, courts construe insurance contracts "in accordance with the plain language of the policies as bargained for by the parties." *Auto-Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla. 2000) (citation omitted).   In Florida, courts construe insurance contracts in a manner that is "reasonable, practical, sensible, and just" and give terms used in a policy their plain and ordinary meaning and read in the light of the skill and experience of ordinary people.  *U.S. Fire Ins. Co. v. Freedom Village of Sun City Ctr., Ltd.*, 279 F. App'x 879, 880-81 (11th Cir. 2008) (citations and internal quotation marks omitted); *see also Alexandra H.*, 833 F.3d at 1307 ("We first look to the plain and ordinary meaning of the policy terms to interpret the contract.").   Indeed, insurance contracts must be construed according to their plain meaning, with any ambiguities construed against the insurer and in favor of coverage.  *Taurus Holdings, Inc. v. U.S. Fid. and Guar. Co.*, 913 So.2d 528, 532 (Fla. 2005); *see also Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So.2d 161, 165 (Fla. 2003) ("In considering this clause we must follow the guiding principle that this Court has consistently applied that insurance contracts must be construed in accordance with the plain language of the policy.").   In interpreting contracts under Florida law, courts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties,

however.  *Taurus Holdings, Inc.*, 913 So.2d at 532 (citation and quotation omitted);

*Swire Pac. Holdings, Inc.*, 845 So.2d at 165 (citations and quotation omitted).

Notably, "[t]he lack of a definition of an operative term in a policy does not

necessarily render the term ambiguous and in need of interpretation by the courts."

*State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So.2d 1072, 1076 (Fla. 1998)

(citations omitted); *see Container Corp. of Am. v. Maryland Cas. Co.*, 707 So.2d 733,

736 (Fla. 1998) ("Of course, the lack of a definition of an operative term used in a

policy does not necessarily mean that the term is ambiguous and therefore in need

of interpretation by the courts.").  Notwithstanding, where the insurer fails to define

a term in a policy, the insurer cannot then take the position that there should be a

narrow, restrictive interpretation of the coverage provided in the policy.  *CTC Dev.*

*Corp.*, 720 So.2d at 1076 (citations and quotations omitted).  In the end, courts

should construe insurance policies as a whole, endeavoring to afford every provision

its full meaning and operative effect.  *Swire Pac. Holdings, Inc.*, 845 So.2d at 166

(citations omitted); *Public Risk Mgmt. of Fla.*, 569 F. App'x 865, 869 (11th Cir. 2014)

(quoting *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 877 (Fla. 2007)) ("When

discerning the meaning of a term, courts must be sure to read the policy as a whole,

endeavoring to give every provision its full meaning and operative effect.") (citation

and internal quotation marks omitted); *see* Fla. Stat. § 627.419(1) ("Every insurance

contract shall be construed according to the entirety of its terms and conditions as

set forth in the policy and as amplified, extended, or modified by any application

therefor or any rider or endorsement thereto.").  In Florida, a single policy provision

should not be construed in isolation, but rather, the court must construe the policy according to the entirety of its terms and conditions. *Gen. Accident Fire & Life Assurance Corp. v. Liberty Mut. Ins. Co.*, 260 So.2d 249, 252 (Fla. Dist. Ct. App. 1972). Namely, "[a] court cannot, under the guise of construction, make a new contract for the parties.…  The terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties—not a strained, forced or unrealistic construction." *Id.* at 253 (internal citation omitted). Accordingly, "when the insurance policy's language is clear and unambiguous, the policy must be given its natural meaning." *Council v. Paradigm Ins. Co.*, 133 F. Supp. 2d 1339, 1343 (M.D. Fla. 2001) (citation omitted).

Neither party contends that the provisions of the Policy are ambiguous, but, instead, they disagree as to the application of those provisions.  To reiterate, the Policy defines "disability" to mean that because of an injury or sickness, a significant change occurred in the individual's mental or physical functional capacity, with "sickness" defined to include a disease, disorder, or condition, *including pregnancy*, that requires treatment by a physician (R. 30, 32).  The Policy permits Omaha to deny LTD benefits for any disability "caused by, attributable to, or resulting from" a pre-existing condition, which the Policy defines as any injury or sickness, necessarily including pregnancy, for which the individual "received medical treatment, advice or consultation, care or services, including diagnostic measures, or had drugs or medicines prescribed or taken in the 3 months prior" to

36

the day the individual became insured under the Policy (R. 23).  The inquiry then turns to whether Dr. Williams had a pre-existing condition, as defined by the Policy, for which she received medical treatment, advice or consultation, care or services, or had drugs or medications prescribed or taken during the look-back period and, if so, whether her alleged disability was caused by, attributable to, or resulted from such pre-existing condition.   Courts considering similar pre-existing condition exclusions in ERISA policies make decisions highly dependent upon the individualized factual scenarios at issue in each case.  *See Goetz v. Greater Ga. Life Ins. Co.*, 649 F. Supp. 2d 802, 816-21 (E.D. Tenn. 2009) (collecting cases).

Here, as Dr. Williams contends, she did not receive treatment for a stroke during the look-back period.  She did, however, receive treatment for both her pregnancy and her mitral valve stenosis.  The record indicates that Dr. Williams received medical treatment, advice, and consultation from a cardiologist and an obstetrician during the look-back period related to her pregnancy and mitral valve stenosis, including discussion of abnormal findings related to her left atrium; underwent diagnostic measures in the form of two echocardiograms; and had aspirin and metoprolol prescribed (R. 1106-11, 1211-14, 1401, 1420, 1422-28). Additionally, during the look-back period, Dr. Demori identified Dr. Williams's WHO maternal cardiovascular risk level as a WHO class III/IV; noted the elevated mitral valve gradients, partially attributing the elevation to an increase in cardiac output and volume related to pregnancy; and scheduled an echocardiogram with the stated purpose of monitoring the mitral valve gradients, the RVSP, and right

ventricle (R. 1111).  Given this record, Omaha correctly found that Dr. Williams's pregnancy and mitral valve stenosis constituted pre-existing conditions under the Policy (*see* R. 96-98, 102-08, 137-44, 430-40, 457-65).

Omaha likewise properly concluded that Dr. Williams's stroke was caused by, attributable to, or resulted from such pre-existing conditions.  Though the Policy does not define the phrase "caused by, attributable to, or resulting from," the record supports Omaha's conclusion.  The contemporaneous treatment notes attribute Dr. Williams's stroke to her hypercoagulable state of pregnancy and mitral valve issues. Mainly, Dr. Velez indicated that Dr. Williams's acute stroke was likely caused by her hypercoagulable state of pregnancy in the setting of the left atrial thrombus (R. 472-79).   Similarly, during her December 3, 2018 admission, the radiologist questioned whether a cardiac source existed for the thromboembolic event, particularly in light of Dr. Williams's mitral valve surgery in the past, in conjunction with possible hypercoagulable state in the setting of her postpartum status (R. 1163-64).

In asserting that Omaha erred, Dr. Williams relies upon *Bradshaw*, 707 F. App'x 599, for her argument that Omaha employed an improper but-for causation theory for finding that her pre-existing conditions led to her stroke and thus her disability.  Such reliance is misplaced, however.  Essentially, Dr. Williams contends that she did not treat for a stroke or thrombosis or have any symptoms of either during the look-back period, so, the only way for Omaha to apply the pre-existing condition exclusion, is to conclude that, but for her healthy pregnancy and mitral

stenosis, she would not have developed a thrombus, which likely contributed to her stroke, which itself caused, contributed to, or resulted in disability.  As Dr. Williams contends, he Eleventh Circuit rejected a similar but-for theory of causation in *Bradshaw*.  *Id.* at 609-10.

Although similar to the extent that each plaintiff was pregnant and then suffered a stroke less than two weeks following the birth of her child, this case and *Bradshaw* diverge in a distinct and dispositive way.  As the opening sentence indicates, the *Bradshaw* plaintiff experienced a healthy pregnancy with *no other pre-existing medical conditions* when she purchased a disability-insurance policy from the defendant, and her pregnancy proceeded without incident.  *Id.* at 600-01.  Nine days after giving birth, she suffered a debilitating stroke.  *Id.* at 600-01.  Her disability insurer then denied her claim because of her healthy pregnancy at the time she purchased the policy, which the disability insurer asserted qualified as a pre-existing condition that "contributed to" her stroke and for which she received treatment during the look-back period.  *Id.* at 600.  In finding that the insurer erred, the Eleventh Circuit highlighted the fact that the only condition the *Bradshaw* plaintiff had during the look-back period was a healthy pregnancy, which, on the record before the court, could not be said to have substantially contributed to the plaintiff's total disability.  *Id.* at 609.

In contrast, the record before this court indicates that a healthy pregnancy was not the only condition Dr. Williams had or was treated for during the look-back period.  Quite the opposite in fact.  The pre-existing health conditions at issue

here are neither remote, attenuated, or unrelated to Dr. Williams's alleged disabling condition.  *Cf. Pritcher v. Principal Mut. Life Ins. Co.*, 93 F. 3d 407, 411-17 (7th Cir. 1996) (finding that the plaintiff's treatment for a fibrocystic breast condition during the timeframe immediately prior to the effective date of her health insurance coverage did not qualify as a treatment for a pre-existing condition as it was unrelated to her breast cancer detection and treatment occurring during the coverage period).  Nor were her pre-existing conditions just one in a series of factors or occurrences that contributed to Dr. Williams's stroke.  *Cf., Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1010 (10th Cir. 2004) (*per curiam*), *abrogated in part by Glenn*, 554 U.S. at 116; *Goetz*, 649 F. Supp. 2d at 824-26.  Similarly, her pre-existing conditions could not be classified as latent, undiagnosed, or unappreciated conditions that had no bearing on her alleged disabling condition.  *Cf. McLeod v. Hartford Life and Acc. Ins. Co.*, 372 F.3d 618, 620 (3d Cir. 2004) (holding that the plaintiff did not receive treatment for a pre-existing condition under her ERISA plan prior to her effective date of coverage because neither she nor her physicians either knew or suspected that the symptoms she experienced were in any way connected with her eventual multiple sclerosis diagnosis); *Pritcher*, 93 F. 3d at 411-17.  Further, and contrary to Dr. Williams's contention, such conditions were not mere risk factors.  *Cf., e.g., Meyer v. UNUM Life Ins. Co. of Am.*, 95 F. Supp. 3d 1234, 1251-52 (D. Kan. 2015) (finding that the insurer erred in treating plaintiff's risk factors for stroke (atrial fibrillation and hypertension) as proxies for pre-existing conditions and jumping directly to the question of causation, in concluding that the insurer acted

arbitrary and capricious in denying benefits).  As early as October 2017, before Dr. Williams even became pregnant, Dr. Williams was cautioned as to the risk for thrombosis of the valve being higher during pregnancy due to pregnancy being a hypercoagulable state, the added strain on the heart and cardiovascular system from the physiologic changes associated with pregnancy, and the potential for cardiac decompensation during pregnancy, including arrhythmia and congestive heart failure (R. 534-36).  The treatment she received for her pregnancy and mitral valve stenosis during the look-back period related specifically to those concerns, and, as Omaha determined, the subsequent stroke she suffered was substantially caused by, substantially contributed to by, and substantially resulted from Dr. Williams's pre-existing conditions of pregnancy and mitral valve stenosis.  *See Bradshaw*, 707 F. App'x at 608 (citations omitted) (concluding that the language "caused by, contributed to by; or resulting from a Pre-existing Condition" must be construed to exclude coverage for only those losses substantially caused by, substantially contributed to by, or substantially resulting from a pre-existing condition).  Omaha therefore properly predicated its denial of LTD benefits upon an appropriate application of the pre-existing condition exclusion provision in the Policy.  Accordingly, Omaha's benefits-denial decision is not wrong and should thus be affirmed.

Even assuming, *arguendo*, that Omaha's decision was wrong, reasonable grounds supported the denial decision, and the conflict of interest did not render the decision arbitrary and capricious.  To start, Dr. Williams points to the fact that Dr.

Demori offered an opinion in January 2020 directly contradicting Omaha's finding

(R. 206-07).  In relevant part, Dr. Demori concluded:

> Dr. Williams[] had elevated transmitral gradients during pregnancy associated with increased volume and cardiac output related to pregnancy, not related to true anatomic significant mitral stenosis (more functional mitral stenosis).  The fact that her transmitral gradients significantly improved 3-4 months after delivery, argues against significant mitral valve repair; however not elevated enough to cause symptoms or require intervention.  Therefore, I do not believe this is the likely cause of stroke[.]

(R. 207).  Although such opinion weighs against Omaha's conclusion, even where

the claimant's doctors provide different medical opinions than the plan

administrator's independent doctors, the plan administrator may afford different

weight to those opinions without acting arbitrarily or capriciously.  *Blankenship*, 644

F.3d at 1356 (citations omitted).  "Plan administrator need not accord extra respect

to the opinions of a claimant's treating physicians."  *Id.* (citation omitted).  The fact

that one of Dr. Williams's treating physicians offered a contrary opinion does not

render Omaha's decision arbitrary or capricious.

Beyond that, the record before Omaha provided a reasonable basis for the

LTD benefits denial decision.  Primarily, the repeated discussions between Dr.

Chapa and Dr. Williams regarding the cardiac risks associated with pregnancy and

mitral valve stenosis, both before and after Dr. Williams became pregnant; the

continued monitoring, diagnostic testing, and treatment for pregnancy and mitral

valve stenosis throughout her pregnancy, including during the look-back period; Dr.

Williams's prior history experiencing a TIA, or ministroke; Dr. Demori and Dr.

Desai assessing Dr. Williams's cardiovascular risk as a WHO III/IV, meaning

significantly increased risk to extremely high risk of maternal mortality or severe morbidity, during and after the look-back period, with Dr. Desai noting that the elevated mitral valve gradients appeared partially related to the increased cardiac output and volume relating to pregnancy; the statements of the radiologist who performed the angiogram questioning whether a cardiac source existed for the thromboembolic event, particularly in light of Dr. Williams's mitral valve surgery in the past, in conjunction with possible hypercoagulable state in the setting of her postpartum status; and the statements from Dr. Velez that Dr. Williams's acute stroke was likely caused by her hypercoagulable state of pregnancy in the setting of the left atrial thrombus established a reasonable basis upon which Omaha could conclude that Dr. Williams's alleged disability was caused by, attributable to, or resulted from her pre-existing conditions, as defined in the Policy.  Although Dr. Williams contends that the evidence requires inferential leaps and that Omaha engaged in but-for causation to reach that conclusion, the record demonstrates otherwise.

Moreover, Omaha submitted the claim and the appeal to medical professionals, albeit medical practitioners employed by Omaha, for provision of objective medical opinions.  Omaha initially submitted the claim for review to a nurse case manager (R. 459-65) and then, on appeal, submitted the claim for review to Dr. Reeder, who is both a licensed physician and Omaha's Vice President and Medical Director (R. 139-44).  Each individual provided a detailed and in-depth analysis of the evidence of record in support of his or her conclusions.  Nothing in

either report indicates that a conflict of interest played any part in the determination.

Notably, Dr. Reeder explicitly certified the following:

> I, Thomas A. Reeder, M.D[.], am a physician duly licensed to practice medicine in the state of Nebraska. I am a salaried employee of Mutual of Omaha. My job duties are to review claim files; to render medical opinions regarding the records contained therein; and to consult with and advise claim staff regarding medical issues. I am not responsible for deciding whether a claimant is entitled to insurance benefits. My role is to provide objective medical opinions to Mutual of Omaha benefits personnel.
>
> My compensation does not depend upon the outcome of my reviews or the substance of my medical opinions. Mutual of Omaha has never expressed to me any requirements or expectations regarding the ultimate conclusion or opinions I provide, other than that I provide well-reasoned, professional opinions based on thorough review of all relevant and available information. I do not believe that either my compensation or my continued employment with Mutual of Omaha is contingent in any way on the ultimate conclusions or opinions I provide.

(R. 144). In addition, in the final letter to Dr. Williams from Omaha, the claims examiner set forth a similar certification (R. 102-08). Specifically, the claims examiner stated:

> I take my obligation to review the claim seriously and have made this benefit determination based upon all of the information in the claim file and the provisions of the insurance contract. I have not had contact with company actuaries or financial personnel and have no information with regard to the effect of this claim handling on company financial results. You should also know that I did not receive, nor was I eligible to receive, any financial or other incentive or penalty based on the denial or approval of the claim.

(R.106). While a conflict of interest existed, the record reflects that such conflict did not affect Omaha's decision in this instance. Indeed, nothing in the record illustrates that the conflict played a part in Omaha's decision-making process.

44

In sum, the decision by Omaha to deny LTD benefits to Dr. Williams was not wrong.  Even if the decision was wrong, Omaha had a reasonable basis for determining that the pre-existing exclusion applied, thereby precluding an award of benefits.  Although a conflict of interest existed, such conflict did not render Omaha's decision arbitrary and capricious.  Accordingly, it is recommended that summary judgment be granted for Omaha and denied for Dr. Williams.[10]

### IV.   Conclusion

For the foregoing reasons, it is hereby

RECOMMENDED:

1.      Omaha's Motion for Summary Judgment (Doc. 22) be GRANTED.

2.      Dr. Williams's Motion for Summary Judgment (Doc. 23) be DENIED.

3.      Judgment be entered in favor of Omaha and against Dr. Williams.

4.      The Clerk be directed to close the case and terminate all deadlines.

IT IS SO REPORTED in Tampa, Florida, this 12th day of April, 2021.


_____
ANTHONY E. PORCELLI
United States Magistrate Judge

---

[10]  The gravity of the situation Dr. Williams faces is not lost on the undersigned in reaching this conclusion.

## **NOTICE TO PARTIES**

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections.  28 U.S.C. § 636(b)(1)(C).  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).


cc:    Hon. James S. Moody, Jr.
       Counsel of Record